**FILED**

APR 2 5 2017

Clerk, U.S. District Court
District Of Montana
Billings

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## HELENA DIVISION

| | |
|---|---|
| LL LIQUOR, INC., d/b/a Lolo Liquor, a Montana corporation, | No. CV 15-71-H-SEH |
| Plaintiff, | |
| vs. | **OPINION AND ORDER** |
| STATE OF MONTANA; STEVE BULLOCK, in his official capacity as the Governor of Montana; MONTANA DEPARTMENT OF REVENUE; MIKE KADAS, in his official capacity as the Director of the Montana Department of Revenue; and JOHN DOES I-X, | |
| Defendants. | |

### Introduction

This case arises from an Agency Franchise Agreement[1] ("Contract")

between Plaintiff Lolo Liquor ("LL") and Defendant the State of Montana

---

[1] Doc. 5-1.

Department of Revenue ("DOR"). The Contract was originally executed between the DOR and LL's predecessor-in-interest,[2] who assigned his interest in the Contract to LL in August–September, 2014.[3]

The Montana Legislature enacted Senate Bill 193[4] in 2015, which amended, *inter alia*, Montana Code Annotated § 16-2-101(4) (2013). In turn, Montana Code Annotated § 16-2-101(4) (2015) ("16-2-101(4)") amended the commission rate for all agency franchise liquor stores, including the agreement between LL and the DOR.

LL brought this action alleging that 16-2-101(4) violates the contract clauses of the United States and Montana Constitutions by decreasing LL's commission rate under the Contract. LL also asserted claims: for breach of contract and breach of the covenant of good faith and fair dealing; for "class of one" equal protection violation; for unconstitutional taking; and for substantive due process violation.

Defendants moved for summary judgment on all claims on March 7, 2017.[5]

_____

[2] LL's predecessor-in-interest is identified in the papers by name only: Robin Hawkinson.

[3] Neither party challenges the validity of the assignment.

[4] *See* Doc. 8-2.

[5] Doc. 36.

LL moved for partial summary judgment on the Contract Clause claim on March 9, 2017.[6] Plaintiff filed a Motion in Limine to Exclude the State's Expert Opinion Testimony on March 17, 2017.[7] Defendants filed a multiple issue Motion in Limine on March 20, 2017.[8] All motions are fully briefed.

The Court conducted a hearing on the motions[9] on April 21, 2017. Plaintiff was represented by Jesse C. Kodadek, Esq. and Ronald A. Bender, Esq. Defendants were represented by Christopher Sweeney, Esq., W. Anderson Forsythe, Esq., and Teresa Grace Whitney, Esq.

For the stated reasons which follow, Defendants are entitled to judgment on each and all claims asserted by Plaintiff. 16-2-101(4) did not "substantially impair" Plaintiffs rights under the Contract Clause. LL's claims for breach of contract and breach of the implied covenant of good faith and fair dealing fail as a matter of law. LL has asserted no valid "class of one" equal protection claim. Change in the commission rate paid to LL did not violate its rights under the Takings Clause. Implementation of the change in law under 16-2-101(4) did not

---

[6] Doc. 39.

[7] Doc. 45.

[8] Doc. 47.

[9] Doc. 36; Doc. 39; Doc. 45; Doc. 47.

deprive LL of substantive due process rights.

## Summary Judgment Standard

Summary judgment is appropriate when the record establishes there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[10] "[S]ubstantive law [identifies] which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[11] A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[12] "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."[13] "'In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.'"[14]

---

[10] Fed. R. Civ. P. 56.

[11] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[12] *Id.*

[13] *Id.* at 255.

[14] *Jones v. Williams*, 791 F.3d 1023, 1030–31 (9th Cir. 2015) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).

## Background

1. **Undisputed Facts**

   a. **Agency Franchise Stores**

The State of Montana, through the DOR, like 16 other states, maintains a monopoly on the distribution of liquor within the state.[15] DOR maintains and operates "a liquor warehouse that sells only to agency franchise [liquor] stores at rates fixed by the DOR."[16] Ninety-six agency stores currently exist in Montana.[17] Agency stores are authorized to sell wholesale to bars and taverns at a statutorily-fixed price or at retail to the public at a price set at not less than the state-fixed minimum price.[18]

The contract terms between each agency store and DOR are reflected in separate agency franchise agreements negotiated between DOR and the stores.[19] The base purchase price is set by DOR and is the same for all stores.[20] The

---

[15] Doc. 53 at ¶ 1 (Defendants' Statement of Disputed Facts re: Lolo Liquor's Motion for Partial Summary Judgment on Count 1, Pursuant to L.R. 56.1(b)) (hereinafter "DSDF").

[16] DSDF at ¶ 2.

[17] DSDF at ¶ 3.

[18] Doc. 50 at ¶¶ 11, 13 (LL Liquor's Statement of Disputed Facts) (hereinafter "PSDF").

[19] PSDF at ¶¶ 5, 6.

[20] PSDF at ¶ 7.

ultimate purchase price paid by stores is taxed at a discounted level based on specific criteria.[21] The discount is referred to as a "commission rate."[22] An agency store's gross profit is determined by the difference between the price it pays to DOR at its predetermined commission rate and its sales price to third parties.

Prior to implementation of 16-2-101(4), an agency store's commission rate was based on three statutory discounts: a negotiated discount, "the weighted average discount ratio, and the sales volume discount."[23] The weighted-average discount ratio in turn was based on sales data from fiscal year 1994.[24] However, that weighted-average discount ratio was held unconstitutional by Judge Pinski, Eighth Judicial District, Cascade County on April 1, 2015.[25]

### b. Senate Bill 193 (16-2-101(4))

Senate Bill 193, which became effective February 1, 2016, amended, *inter alia*, the commission rate calculation for all agency stores.[26] The new 16-2-101(4) rate program specified a commission rate of 16% for stores with annual liquor

---

[21] PSDF at ¶ 7.

[22] *See* PSDF at ¶ 6.

[23] PSDF at ¶ 8.

[24] PSDF at ¶ 8.

[25] *See* Doc. 12-3.

[26] PSDF at ¶¶ 23, 24.

purchases of not more than $250,000, with commission rates decreasing on a sliding scale to 12.15% for stores with more that $7 million in annual liquor purchases.[27] Changes in commission rates were slated to be phased in over three years, beginning February 1, 2016.[28]

### c. Lolo Liquor

LL's current owners, Josh and Leigh Paffhausen, purchased LL in 2014.[29] Their predecessor-in-interest had entered into a ten-year term Agency Franchise Agreement with DOR on March 1, 2013.[30] The Contract was signed by Paffhausens on August 21, 2014,[31] after it was reviewed by Paffhausens' retained legal counsel.[32]

As noted above, before 16-2-101(4) was implemented, LL's commission rate was 16.144%.[33] If it were assumed that LL would purchase more than $7 million of liquor annually from the state as it claims, LL's commission rate would

---

[27] PSDF at ¶ 25.

[28] PSDF at ¶ 26.

[29] DSDF at ¶ 25.

[30] DSDF at ¶ 25.

[31] *See* Doc. 5-1.

[32] PSDF at ¶ 20.

[33] PSDF at ¶ 27; *see* Doc. 5-1 at 11–12.

be 12.15% after the three-year phase-in period.[34]

LL made approximately $1 million in liquor purchases in 2013 under the previous owner.[35] After Paffhausens bought LL in 2014, the company had $4.86 million in sales in 2014, $8.3 million in 2015, and $10.5 million in 2016.[36]

The substantial growth of LL is attributed primarily to its acquisition of wholesale accounts (bars and taverns) that previously were serviced by other agency stores.[37] LL claims it was able to acquire these accounts by offering ancillary services such as payment by credit card and stocking of shelves with product, as opposed to merely dropping off cases of liquor in a bar.[38] Since bars and taverns pay the same price for liquor purchased in Montana regardless of from which agency store the purchase is made, ancillary services like credit card payment and courtesy shelve stocking are means by which agency stores differentiate themselves in the eyes of bar and tavern owners.[39]

---

[34] PSDF at ¶ 27.

[35] PSDF at ¶ 30.

[36] PSDF at ¶ 30.

[37] PSDF at ¶¶ 31, 32.

[38] DSDF at ¶¶ 37, 38 (both disputed on other grounds).

[39] *See* DSDF at ¶ 39.

## 2.    Disputed Facts

The only possibly-material factual dispute between the parties concerns a conversation between Josh Paffhausen and one or more DOR employees that occurred prior to Paffhausens' purchase of LL.[40] It is claimed that DOR employees told Josh Paffhausen that LL's commission rate could never be decreased. DOR disputes the assertion. However, even if the disputed assertion were shown to have been made by DOR, it would, in this case, remain as a textbook example of evidence prohibited from introduction by the parol evidence rule.

"[I]n the absence of fraud, duress, or mutual mistake, all extrinsic evidence must be excluded if the parties have reduced their agreement to an integrated writing."[41] "The parol evidence rule precludes the admission of extrinsic evidence of an unambiguous integrated writing in any situation involving parties to the instrument when the rights and duties created by the document are the dispositive issue."[42]

---

[40] *See* DSDF at ¶ 33.

[41] *Baker v. Bailey*, 782 P.2d 1286, 1288 (Mont. 1989).

[42] *In re Marriage of Olson*, 108 P.3d 493, 497 (Mont. 2005) (citing *Habets v. Swanson*, 16 P.3d 1035, 1042 (Mont. 2000)).

LL has not pled fraud, duress, or mutual mistake.[43] Section Eleven of the

Contract contains an integration clause and, as discussed in detail *infra*, the

Contract is unambiguous. Parol evidence inconsistent with the terms of the

Contract would be inadmissable. The dispute over such evidence does not

preclude the entry of summary judgment.

## **The Contract**

The issues in this case are substantially controlled by two provisions of the

Contract: Sections Two and Eleven:

SECTION TWO

AGENCY FRANCHISE AGREEMENT

.    .    .

This Agreement must be renewed every ten years if the requirements
of this Agreement have been satisfactorily performed. Subsequent
changes to the law by the legislature may require terms to change in
future renewals of the agreement.

.    .    .

During the term of this Agreement, the commission percentage
discount rate may be reviewed every three years, as provided by law.

.    .    .

---

[43] *See* Doc. 29.

## SECTION ELEVEN

## MODIFICATION, MERGER, AND DEFINITIONS

1. The parties agree that the Department may amend or modify this Agreement to conform to changes in state or federal laws, or rules or policies of the Department in accordance with Administrative Rules Procedures.

2. This Agreement contains the entire Agreement between the parties, and no statements, promises, or inducements made by either party, which are not contained in this written Agreement, shall be valid or binding. This Agreement shall not be enlarged, modified or altered except in writing signed by all parties, *except that any change required by a change in Montana law shall be effective immediately upon the effective date of such change in law*, notwithstanding the failure of a party to agree in writing to such change; the parties however, shall make reasonable efforts to promptly reduce to writing the specific changes to the provisions of this Agreement that may be required by such change in law.

. . .[44]

LL argues that Section Two provides the *only* two ways its commission rate may be modified. It further argues that Section Eleven contemplates changes to the law but not changes to their commission rate under 16-2-101(4).

The Contract is to be interpreted to mean what is says, that is, that Section Eleven requires modification of the Contract upon a change in Montana law. Specifically, upon enactment of 16-2-101(4), the Contract required LL's

---

[44] Doc. 5-1 at 1, 14 (emphasis added).

commission rate to be modified.

LL's interpretation of the Contract is untenable. It attempts to insert terms that do not appear in the plain language of the instrument and is derived from a fundamental misunderstanding of the permissive "may" in Section Two. "May" does not connote a mandatory or exclusive course of conduct as claimed. It merely allows for changes to the Contract every three or ten years. Section Two is silent as to other events which might allow for or require modification, such as Section Eleven.

Unlike Section Two, Section Eleven uses the mandatory term "shall." The Contract unambiguously states that a change in Montana law requires immediate modification of the Contract to incorporate the change. 16-2-101(4) changed Montana law, thus triggering mandatory modification of the Contract under Section Eleven.

### Discussion

**1.   16-2-101(4) does not substantially impair the Contract. The Contract Clause claim fails.**

The United States Constitution Article I, Section 10 provides "No State shall . . . pass any . . . law impairing the Obligation of Contracts . . . ." The Montana Constitution similarly mandates that "No . . . law impairing the

obligation of contracts . . . shall be passed by the legislature."[45] "The contract

clauses of the Montana and United States Constitutions have generally been

interpreted as 'interchangeable guarantees against legislation impairing the

obligation of contract.'"[46] The Contract "Clause is not, however, the Draconian

provision that its words might seem to imply."[47] The United States Supreme Court

has long recognized "that the Contract Clause does not operate to obliterate the

police power of the states."[48]

Contract Clause claims are analyzed using a sequential test. First, the Court

determines if the challenged state law "substantially impairs" the contract in

question.[49] "Total destruction of contractual expectations is not necessary for a

finding of substantial impairment."[50] "On the other hand, state regulation that

restricts a party to gains it reasonably expected from the contract does not

---

[45] MONT. CONST. art. II, § 31.

[46] *City of Billings v. Cty. Water Dist. of Billings Heights*, 935 P.2d 249, 251 (Mont. 1997) (quoting *Carmichael v. Workers' Compensation Court*, 763 P.2d 1122, 1125 (Mont. 1988)).

[47] *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978).

[48] *Id.* at 241.

[49] *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003); *City of Billings*, 935 P.2d at 251.

[50] *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983) (citing *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 26–27 (1977)).

necessarily constitute a substantial impairment."[51] "An impairment of a public contract is substantial if it deprives a private party of an important right . . . thwarts performance of an essential term . . . defeats the expectations of the parties . . . or alters a financial term."[52] If no substantial impairment exists, the claim fails and the inquiry ends.

If a substantial impairment does exist, the next question is whether the state has a significant and legitimate purpose for the law.[53] If so, the final inquiry is whether the law imposes reasonable conditions which are reasonably related to achieving the state's significant and legitimate purpose.[54]

The only impairment arising from the amendment in § 16-2-101(4) of which LL complains is the lowering of LL's commission rate by 4%. This impairment is not substantial and does not alter the fundamental nature of the Contract. Nor does it deprive LL of any right guaranteed by the Contract.

LL predicts it will lose some $600,000 in gross revenue yearly once 16-2-101(4) is fully implemented. However, "when considering substantial impairment, [courts] focus on the importance of the term which is impaired, not the dollar

---

[51] *Id.* (citing *U.S. Trust Co.*, 431 U.S. at 31).

[52] *S. Cal. Gas Co.*, 336 F.3d at 890 (citations omitted).

[53] *Energy Reserves Grp., Inc.*, 459 U.S. at 411.

[54] *Id.* at 412.

amount."[55]

LL entered into the Contract with full knowledge that the liquor industry in Montana is heavily regulated.[56] The Contract itself, in three separate sections, gives notice that commission rates may change.[57] A downward adjustment in commission rate clearly was not beyond the reasonable expectations of the parties to the Contract, especially in light of Section Eleven's unequivocal language that changes in Montana law will immediately modify the Contract. The effect of 16-2-101(4) in restricting LL to gains it reasonably expected from the Contract is not a substantial impairment.

LL makes the hyperbolic argument that a ruling in favor of Defendants will give the state unbridled power to manipulate its contracts. The undisputed material facts of this case, however, warrant the ruling as a matter of law that the Contract Clause was not violated. In this Court, the law is applied to the facts presented, no more, no less. The Court cannot and will not make a ruling or offer any advisory opinion regarding some hypothetical action by the state.

Defendants are entitled to summary judgment of the Contract Clause claim.

---

[55] *S. Cal. Gas Co.*, 336 F.3d at 892.

[56] PSDF at ¶ 17.

[57] Doc. 5-1 at 1, 11, 14.

-15-

The Contract is unambiguous. 16-2-101(4) did not substantially impair the obligations of the Contract contrary to either the United States or Montana Constitutions.

## 2. Defendants did not breach the Contract or the implied covenant of good faith and fair dealing.

### a. Breach of Contract

Under Montana law, "'a breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of a contract.'"[58] No breach can be said to have taken place by implementation of 16-2-101(4).

LL argues that the promise Defendants are failing to perform is "a commission that can be changed only with the consent of the franchisee during the ten-year term of the contract."[59] However, no such promise is to be found in the Contract. Section Eleven clearly states that the Contract shall be modified to comport with changes in Montana law, "notwithstanding the failure of a party to agree in writing to such change . . . ."[60] Nothing in the record suggests Defendants have acted contrary to the terms of the Contract. Defendants are entitled to

---

[58] *State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 411 (Mont. 2013) (quoting Richard A. Lord, *Williston on Contracts* vol. 23, § 63:1 at 434 (4th ed., West Group 2002)).

[59] Doc. 49 at 25.

[60] Doc. 5-1 at 14.

summary judgment of the claim for breach of contract.

### b. Breach of the Implied Covenant of Good Faith and Fair Dealing

"'[T]he [implied] covenant [of good faith and fair dealing] is a mutual promise implied in every contract that the parties will deal with each other in good faith, and not attempt to deprive the other party of the benefits of the contract through dishonesty or abuse of discretion in performance.'"[61] "The covenant . . . [however] cannot be read to prohibit a party from doing that which the agreement expressly permits."[62]

LL alleges that Defendants violated the covenant "[b]y not advocating for or insisting upon a savings clause in [Senate Bill] 193, and by arguing that the generic modification clause of Section 11 of the [Contract] allowed DOR to void fundamental provisions of the [Contract] . . . ."[63] LL further argues that a breach occurred "when DOR employees made repeated assurances to Robin Hawkinson and then the Paffhausens that the commission rate could never be lowered during

---

[61] *Phelps v. Frampton*, 170 P.3d 474, 482 (Mont. 2007) (quoting *Beaverhead Bar Supply v. Harrington*, 805 P.2d 560, 564 (Mont. 1991)).

[62] *Hardy v. Vision Serv. Plan*, 120 P.3d 402, 405 (Mont. 2005) (citing *Farris v. Hutchinson*, 838 P.2d 374, 377 (Mont. 1992)).

[63] Doc. 29 at 17, ¶ 80.

the term of the contract."[64] The short answer is none of these allegations, even if factually proven, support a claim.

The first, not advocating for a savings clause in Senate Bill 193, is not supported by law. Further, it is simply unreasonable to assume that DOR had the duty, somehow derived from the Contract, to advocate before the legislature in favor of LL's interest. It defies logic and reason to assert that DOR's argument for a reasonable interpretation of the Contract somehow breaches the covenant.

The third argument, that DOR employees allegedly told LL's past and current owners that the commission rate could never go down, is an effort to vary the clear terms of the Contract by injection of inadmissable parol evidence. No admissible evidence of this specific claim is properly before the Court, it is unworthy of further consideration. Summary judgment for Defendants on LL's second claim, breach of contract and for breach of the implied covenant of good faith and fair dealing, is appropriate.

**3.     LL is not treated differently from other agency stores. The equal protection "class of one" claim fails.**

Both the United States and Montana Constitutions provide that no person will be denied equal protection of the laws.[65] Under the United States Constitution,

---

[64] Doc. 49 at 25–26.

[65] U.S. CONST. amend. XIV, § 1; MONT. CONST. art. II, § 4.

"'an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called "class of one."'"[66] However, such a "class of one" claim in this case fails.

LL did not present, nor does this Court discern, a legal basis for its "class of one" claim under the Montana Constitution.[67] Its equal protection claim will be treated as a claim under the United States Constitution only.

To succeed with the "class of one" claim, LL must demonstrate that the Defendants: (1) intentionally; (2) treated LL differently from others similarly situated; and did so (3) without a rational basis.[68]

As evidence that 16-2-101(4) does not treat LL differently from other agency stores, Defendants cite to the statute itself, which states in pertinent part:

> Beginning February 1, 2016, each agency liquor store's commission rate is equal to the agency liquor store's combined commission rate on December 31, 2015, plus 1/3 of the difference between the agency liquor store's commission rate as determined in subsection (4)(b) and the agency liquor store's combined commission rate on December 31, 2015. Beginning February 1, 2017, each agency liquor store's commission rate is equal to the agency liquor store's

---

[66] *Gerhart v. Lake Cty.*, 637 F.3d 1013, 1021 (9th Cir. 2011) (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008)).

[67] *See* Doc. 49 at 26–27.

[68] *See Gerhart*, 637 F.3d at 1022.

combined commission rate on December 31, 2015, plus 2/3 of the difference between the agency liquor store's commission rate as determined in subsection (4)(b) and the agency liquor store's combined commission rate on December 31, 2015. Beginning February 1, 2018, each agency liquor store's commission rate is determined as in subsection (4)(b).[69]

The statute plainly applies to all agency stores. LL fails to offer any evidence that it is being treated differently from other agency stores.

LL argues that 16-2-101(4) detrimentally affected its business more than any other agency store. However, the equal protection "class of one" test is whether the state treated LL differently from other agency stores, not whether the state's uniform treatment of all agency stores affected LL differently.

LL is not being treated differently from other agency stores. Defendants are entitled to summary judgment on the equal protection "class of one" claim.

### 4. Defendants have not taken a property interest from LL. The Takings Clause claim fails.

The United States and Montana Constitutions both provide that private property cannot be taken for public use without just compensation.[70] "[T]he protection against a 'taking' of private property under [the Montana Constitution]

---

[69] MONT. CODE ANN. § 16-2-101(4)(a) (2015).

[70] U.S. CONST. amend. V; MONT. CONST. art. II, § 29.

is coextensive with the protection given under the [United States Constitution]."[71] Established Ninth Circuit precedent analyzes Takings Clause claims in two steps: "first, . . . determine whether the subject matter is 'property' within the meaning of the Fifth Amendment and, second, . . . establish whether there has been a taking of that property, for which compensation is due."[72]

The United States Supreme Court has stated that for purposes of the Takings Clause, "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."[73] "Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."[74]

In *Penn Central Transportation Company v. City of New York*, the United States Supreme Court established that three factors are relevant to determining if a regulatory taking has occurred: (1) "[t]he economic impact of the regulation on the claimant . . . [(2)] the extent to which the regulation has interfered with distinct investment-backed expectations . . . [and (3)] the character of the governmental

---

[71] *Buhmann v. State*, 201 P.3d 70, 85 (Mont. 2008).

[72] *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 1002 (9th Cir. 2007) (citing *In re Consol. U.S. Atmospheric Testing Litig.*, 820 F.2d 982, 988 (9th Cir. 1987)).

[73] *Lynch v. U.S.*, 292 U.S. 571, 579 (1934).

[74] *U.S. Trust Co.*, 431 U.S. at 19 n. 16 (citing *Contributors to Penn. Hospital v. Philadelphia*, 245 U.S. 20 (1917)).

action."[75] In making a Penn Central analysis, "[t]here is no set formula for determining when an economic injury occasioned by regulation must be compensated by government."[76]

LL has claimed that 16-2-101(4) acts as a regulatory taking of its property interest. Precisely what property interest LL claims has been taken is not adequately identified and remains unclear. The Complaint alleges the property interest to be the Contract.[77] However, the Contract was not "taken." It remains as a valid and binding obligation of both parties, albeit in a modified form after 16-2-101(4) went into effect in 2016, leaving LL with the complaint that it no longer may claim the 16.144% commission rate. However, the 16.144% commission rate was not a right. Rather, it was subject to both Section Two and Section Eleven of the Contract, which clearly stated the commission rate may be modified as appropriate under the law. LL did not have a vested right to the 16.144% commission rate. It had and continues to have a right to a commission rate calculated under applicable Montana law. Neither 16-2-101(4) nor any of the Defendants have taken that contract right from LL.

---

[75] *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

[76] *Am. Sav. and Loan Ass'n v. Cty. of Marin*, 653 F.2d 364, 368 (9th Cir. 1981) (citing *Penn Cent. Transp. Co.,* 438 U.S. at 124).

[77] *See* Doc. 29 at 20.

-22-

Summary judgment for Defendants on the Takings Clause claim is appropriate.

**5.    16-2-101(4) is not arbitrary or unreasonable. It has a legitimate public purpose. The substantive due process claim fails.**

The United States Constitution and the Montana Constitution both provide that no person shall be deprived of life, liberty, or property without due process of law.[78] No due process claim is raised.

**a.    Fourteenth Amendment Substantive Due Process**

Under the United States Constitution, "'[a] threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution.'"[79] "Protected property interests 'are not created by the Constitution[, but r]ather ... they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'"[80]

As stated above, LL had a property interest in a commission rate lawfully calculated by Montana law, no more, no less. 16-2-101(4) did not deprive LL of

---

[78] U.S. CONST. amend. XIV, § 1; MONT. CONST. art II, § 17.

[79] *Ching v. Mayorkas*, 725 F.3d 1149, 1155 (9th Cir. 2013) (quoting *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994)).

[80] *Johnson v. Rancho Santiago Community College Dist.*, 623 F.3d 1011, 1030 (9th Cir. 2010) (citing *Wedges/Ledges of Cal.*, 24 F.3d at 62).

this right. The due process claim under the United States Constitution fails.

### b.    Montana Substantive Due Process

Unlike Fourteenth Amendment substantive due process, a substantive due process claim under the Montana Constitution may exist "'[e]ven though a plaintiff may have no property or liberty interest grounded in state law which is protected from arbitrary government action . . . .'"[81] Indeed, the Montana Supreme Court recently noted that "[t]here is no need to define life, property or liberty for substantive due process analysis . . . . All laws might be said to restrict [an] individual's use of property rights or personal liberty, in the sense of restricting which actions the individual can take in society."[82]

To establish a violation of substantive due process under the Montana Constitution, LL must overcome the presumption that 16-2-101(4) is constitutional by showing it "is not rationally related to a legitimate interest."[83] Accordingly, the Court examines "(1) whether the legislation in question is related to a legitimate governmental concern, and (2) whether the means chosen by the

---

[81] *Powell v. State Comp. Ins. Fund*, 15 P.3d 877, 884 (Mont. 2000) (quoting *Newville v. State, Dep't of Family Serv.*, 883 P.2d 793, 800 (Mont. 1994)).

[82] *Mont. Cannabis Indus. Ass'n v. State*, 368 P.3d 1131, 1140 (Mont. 2016) (quoting 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 15.5 at 847–48 (5th ed. 2012)).

[83] *Id.*

Legislature to accomplish its objective are reasonably related to the result sought to be attained."[84] "The legislation's purpose 'does not have to appear on the face of the legislation or in the legislative history, but may be any possible purpose of which the court can conceive.'"[85]

Defendants have provided two legitimate purposes behind 16-2-101(4): (1) prevent similarly situated stores from having drastically different commission rates, thereby giving some stores an arbitrary, unfair advantage; and (2) stabilize and preserve the franchise system by eliminating "rate creep."[86] The Court concludes that 16-2-101(4)'s implementation of a uniform, sliding scale calculation for commission rate is rationally related to such purposes.

Defendants are entitled to summary judgment of the substantive due process claims.

ORDERED:

1.    Defendants' Motion for Summary Judgment, Pursuant to Fed. R. Civ. P. 56(a)[87] is GRANTED.

---

[84] *Id.* (citing *Walters v. Flathead Concrete Products, Inc.*, 249 P.3d 913, 918 (Mont. 2011)).

[85] *Id.* at 1141 (quoting *Walters*, 249 P.3d at 920) (internal quotation marks omitted).

[86] *See* Doc. 52 at 18.

[87] Doc. 36.

2.   LL Liquor's Motion for Partial Summary Judgment on Count I[88] is DENIED.

3.   LL Liquor's Motion in Limine to Exclude the State's Expert Opinion Testimony[89] and Defendants' Motions in Limine[90] are DENIED as moot.

4.   The clerk is directed to enter judgment in favor of Defendants consistent with this Order.

DATED this __25th__ day of April, 2017.

_Sam E Haddon_
SAM E. HADDON
United States District Judge

---

[88] Doc. 39

[89] Doc. 45.

[90] Doc. 47.